Seaton, 19-1093. Good morning, Your Honors and Counsel. John R. Ceci from the Federal Defender's Office, appearing for Appellant Michael Seaton. Your Honors, the District Court below has ordered that Mr. Seaton can be forcibly medicated with psychotropic drugs. Counsel, I'm sorry, can you move the mic just a little, yeah, closer to you? Is this better? Yes, we are not hearing you, or at least I'm not hearing you. Your Honors, the District Court below has ordered that Mr. Seaton can be forcibly medicated with psychotropic drugs, not because he is a danger to himself or others, and not simply to ameliorate a mental illness that he's suffering from, but rather to advance the government's interest in trying to restore him to competency for trial. The Supreme Court said in cell that such orders should be rare, and this is not one of those rare cases. I want to start today with cell's second prong, because I think it presents the simplest disposition of this case. On prong two, are you arguing that the District Court, Judge Jackson, could not have found a satisfaction of prong two, or that his explanation was deficient, or both? Both, Your Honor. The court's finding on prong two fails for two independent reasons. One is legal error, and the second is that it's also predicated on insufficient facts. That is clearly erroneous for that reason. The legal error is that the District Court found that the evidence establishes a significant likelihood of restoration by a vote of two to one. That is, that recounting the expert split and simply head-counting the experts. That is plain and blatant legal error. It's not, and it's not a, it's not a script of Well, in fairness, Judge is an experienced judge, and he may have said we've got two witnesses here on this side and the other, but he's certainly not going on a quantitative basis in making his judgment. He does tell us what he considered to be relevant with respect to the testimony of the experts, and, you know, we may or may not agree with it, but certainly he explains it. Yeah. I don't, I don't think it is purely descriptive, though, and I don't think it's a colloquialism. I think it's that vote of two to one is tied to the court's actual ruling. He says the evidence establishes this by a vote of two to one. I think it's very hard to read that as not expert counting in that that conclusion is really inescapable when you consider it in light of his other comments, which are themselves, and other findings, which are themselves, I think, just completely insufficient, partly because his modified findings added nothing of evidentiary value, right? The court simply remarked that one of the witnesses was nice and likable, that has no weight, obviously, that Dr. Serzin had prepared a report. He's required to prepare that report under this court's decision in Chavez. The government cannot obtain a cell order without that type of plan describing which medicines at what dosages. So those facts really don't add anything. The court never said that, it never made an analysis of the reasons behind each expert's opinion. It never said explicitly or implicitly that it found either expert more credible than the others. Quite to the contrary, the court repeatedly indicated that it had heard from three competent experts, that it liked and respected Dr. Fograd, that it found the government's opinion credentialed, I think, at one point, he said. But he never said that he found them more credible. But how does a judge go about? This is a specific scientific or medical issue. And if there's a bench trial before a judge, and the judge is confronted with a clash of experts, the judge will enter a finding, and presumably, and say, I, the judge, find expert X more credible than the other. And the question is, is Judge Jackson being, should he be required to do on this very intricate medical issue of, I think both sides would acknowledge, at least some residual area of uncertainty? Yeah. I think it's a question, as Your Honor says, that comes up in a bench trial, perhaps. It comes up in the administrative law judge context. And we cited a handful of cases, the Sahara Cold case from the Seventh Circuit, and Gunderson case from this court, that looks at the administrative law judge function. But I think it's comparable, right? Because whether it's an administrative law judge, or a magistrate, or an Article III judge, the same principles of rational decision making are at play and are required. And so what I think a judge has to do in that scenario is, and particularly, I think Gunderson has a good discussion of this, is if there is essentially an evidentiary equipoise on some level, that the court has to make some sort of explanation, some sort of reasoned basis for why one view is more persuasive than the other. Or explain why it can't make that determination. And if it can't make that determination, then the party who bears the burden of proof, in this case, the government, hasn't fulfilled it. And it's important to recognize that this is not a preponderance standard, right? This is one of the rare scenarios in which the government bears a burden of establishing its facts by clear and convincing evidence. And I think it's extraordinarily difficult to read Judge Jackson's findings as indicating that the government had met that evidentiary showing in this particular case. So if we had to summarize your primary concern, in a sentence or two, what would you tell us? It's twofold. The court's ultimate conclusion on Cell's second prong was infected with legal error and was based on facts that are either not relevant or insufficient under the governing legal standard. And that's how I would write a reversal in this case. Counsel, can I just ask you then, following up, just what do you make of the court stating that all agreed that the medication would be helpful and would improve his mental condition? Can you, how does that play into your analysis? Let me respond in two ways to that. The first is that helpfulness, I think Judge Jackson's comments about helpfulness are understandable and, frankly, somewhat admirable from a human perspective, that this type of medication is appropriate and might help. It might not restore him to competency, but it might help. And it's similar to the kind of thing we see in Tapia cases, where a court might say someone should go to be imprisoned for a period of time so they can participate in programming or recovery programs. That is understandable from a human perspective, to want to help somebody, but it's distinctly not the judicial function at sentencing, in the same way that it's distinctly not the judicial function under Sell to say that the medication might help, or the only way we'll know if it'll help is to try. So I think that it's understandable, but it's legal error. I think, secondly, I would point you to Dr. Bograd's colloquy with the court during her testimony at the February 21st evidentiary hearing. That's where all this help language comes from. And she was extremely clear with the court that, when he was questioning her directly, whether or not the medication would help Mr. Seaton and whether she would prescribe it in a clinical outpatient context was a totally different question than whether it would restore him to competency. And she was very clear about that. And that's where the court's conversations, I think, about that come from. And so I think that it's, to sum up, I think it's clearly distinguished from competency and appropriately so. And to the extent that the court relied on that as a basis for its Sell order, it's plainly insufficient under Sell. Well, maybe you can just help me then. What was missing here? What should he have, what should the court have said? The court should have denied the Sell order because the government didn't meet its burden. Because the court found, the court's findings suggest that it couldn't reach determination. And when you can't reach determination, that means the party who bears the burden. I think you're overstating the case, aren't you? I mean, it's quite okay to say that the court may have engaged in some, what you would classify as speculation, in arriving at its conclusion. But to articulate it the way you have, that it's, the court just kind of like was bubbling up and didn't have a clue what he was doing, is not quite fair. Well, I'm not meaning to suggest that. And if I've overstated in that context, I want to walk it back. I think the court, I actually think the court was incredibly candid in its articulation of the difficulties in the case. That's overly so, saying that this may work, it may not. I'm not a doctor, but then he said the medical experts do say that there is a probability. This is not a possibility, although the court may have articulated in that manner. But the testimony itself is based on scientific probability, not possibilities. And the medical data that is submitted to us seems to support that proposition, that on the basis of scientific probabilities, more likely than not to restore this gentleman to competency. I think that there might be a preponderance evidentiary showing that could be, could have been made, but it wasn't, obviously. And that's obviously not the standard here. So that's what I don't understand about your argument and about your answer to Judge Ide. You say that it wasn't made. Isn't that evidence in the record? So with respect to that, that scientific literature, I don't think it gets us that far for a couple of reasons. Why is it in the record? The literature itself isn't. There's one citation to a Cochrane report, which is, I believe, available online. That's the only study that looks at post-cell competency restoration in the federal system. That's the one in which the government doctor said about 75 percent restoration in a typical case. But as defense counsel pointed out below, that number excludes the entirety of people who a court had deemed unlikely to be restored. Well, that goes to the credibility, not to the admissibility of the evidence. So it was like 75 percent likelihood. In the most general sense. The other problem with the literature is that, as Dr. Preston herself recognized, was that it doesn't cover people like Mr. Seaton, that he is not sui generis, but he is a unique case in the sense that he has been this sick for this long. And that the literature she acknowledged really doesn't look at this for a variety of reasons, but that it's not, I don't think it answers, this isn't a case where you can say, well, there's other record evidence that we can reach the same conclusion on by any means. There's just simply not an answer one way or the other. And so, sure, you have to look at the personal experience and other doctors, other testimony, but it doesn't, they also didn't have any experience treating someone who was sick for as long as Mr. Seaton. The object here is in treatment, correct? The object, no, the cell order expires at sentencing. So if Mr. Seaton were to be restored to competency, tried and convicted, he goes to DOP, he will no longer be medicated under cell. It's not about treatment. I think that's an important point. So to treat it as, to discuss it in the context of treatment is not appropriate. Or at least it's not, it's not legally, it's not the correct legal standard under which we should look at it. I think that's right. I think it's, it's a relevant consideration, but it's by far not the question presented in cell hearings. I think I'd reserve the rest of my time if there is no further questions. Thank you. Counsel, members of the court, Jim Murphy representing the United States. The issue before the court is really quite simple. The court entered a specific finding that there was a substantial likelihood that medication would restore the defendant to competency and would not impair his ability to assist in his defense, which was the required standard under cell. And the question before this court is does the record support it? Most of the defendant's arguments have focused not on the finding itself, but on off-the-cuff, somewhat informal remarks the judge actually made on the way to those findings. Which would be relevant to the part of his argument on prong two, the fear to make an adequate explanation. But with regard to the issue, the second argument, that no one could reasonably find by clear and convincing evidence that prong two was satisfied, that involuntary medication would be likely to restore Mr. Seton to competency, what is it, or what can you point to in Dr. Preston or Dr. Sarazin's reports or their testimony that would cast any question with regard to the correctness of Dr. Bograd's conclusion? Well, the testimony of Dr. Bograd is that both the two government experts, Sarazin and Preston, both surveyed extensive literature and their own extensive experience in reaching their own conclusions. And where did they? They considered Dr. Bograd's opinion also, which is not true in some of the cases cited by the defense. So they considered that and said it wasn't so much that they were reviewing Dr. Bograd, whose testimony came afterward, they couldn't have. They reviewed her report. So where is it that they said that someone who's not undergone treatment in 40 years could be reasonably likely to be restored to competency? Where is it that they said that? Dr. Preston specifically addressed that, I believe it's page 26 of volume 3. The question came up about the reliability and the applicability of the literature to someone who had not been treated for 40 years, because Dr. Preston said it's very unusual. That's why the literature has little reference to it, because most people with mental illnesses that serious do receive treatment. But then at page 26, she says, yes, that may be seen as a weakness in the literature because it's so rare. However, she then went on to explain specifically her own experiences with several of her own patients who had remained untreated for years, and she said they did respond to treatment. Okay. So with regard to Dr. Preston's testimony, then a fact finder could find by clearing convincing evidence that involuntary medication would be likely to restore Mr. Seaton to competency, because Dr. Preston once had a couple of patients who had gone, I think it was about 10 years, without medication. And so based on those couple of experiences, we could find by clearing convincing evidence that this guy was likely to be restored to competency? We can't excerpt just that testimony from everything else. Well, what else is there? I mean, I asked you what evidence there was in Dr. Preston and Dr. Sarazin's report, and that's what you told me. Because that's what's in the record. Dr. Sarazin also testified that he thought notwithstanding the period, the fact that the defendant had gone years without treatment, that likely, it was substantially likely he would be restored. That was his professional opinion. Right. Which is... This is expert testimony, Judge. Yeah. So let me ask you about this expert testimony of Dr. Sarazin and Dr. Preston. So they say that it is a factor that supports the government, the susceptibility that Mr. Seaton could be restored to competency when someone hasn't undergone a lengthy period of institutionalization, right? Because they're using lengthy period of institutionalization as a signal or as a marker to show that somebody's problems really aren't that serious, correct? They did rely on that. I'm not sure I'm following you, Judge Baxter. Well, did they not rely on the fact that one of the criteria that you look at is whether somebody's got a medical problem, whether somebody has another cognitive disorder... You wouldn't be making the inquiry otherwise, yeah. Serious mental illnesses, sure. That's what they're talking about with regard to the criteria on the CELS inquiry. That's what they said, right? That's correct. Whether somebody's got another medical problem, heart disease, rheumatoid arthritis or whatever, this is what they said, right? These are the criteria, whether somebody has another medical problem. They're talking about people with serious mental problems, not people with arthritis. That's why I'm not following you, Judge. Well, I'm just... I'm not following Dr. Searson and Dr. Preston. They said, if I understand correctly, that the three criteria you look at for a CELS inquiry are whether someone has another medical problem, whether someone has a cognitive disorder, and whether someone has undergone a lengthy period of institutionalization, correct? Those are among the factors, yes. That they testified. I don't think they're talking about arthritis. I think they mean codependent mental disorders. Okay, fine. So with... Delusions, that's... So one of the factors that I think you just alluded to that Dr. Searson relied on in saying that Mr. Seaton could be restored to competency, likely would be restored to competency by clear and convincing evidence, is that he hasn't undergone a lengthy period of institutionalization because he's gone for 40 years without having any treatment whatsoever. What sense does that make? Makes a great deal of sense. This business of having not been treated, while Dr. Preston conceded that it was something to be considered, it's not at all clear that this extensive literature they're talking about does not incorporate this. I don't think that's... Well, they didn't testify that it did.  They testified about what this 70 to 75% meant. But Dr. Preston said it would be unusual. I think she's just making an inference from experience. I don't think they have a category in all these studies of people, how long they've had this illness and when they were first treated with these drugs. But that's Appellate's point, is that Dr. Searson and Dr. Preston are relying on this generalized statistic of 70 to 75%, and none of this data includes someone who hasn't been treated for 40 years. Judge, the record does not say that. It absolutely does not say that. What we have is Dr. Preston conceding that it would be unusual for anyone with schizophrenia to go a long period of time and not be treated. And therefore, she thinks it probably is a factor that warrants separate consideration, and she gave it separate consideration, and she considered that in the context of the studies, which do not, so far as I know, spell that out one way or the other. One question. She says based on her experience, it will work. One question, if you're finished answering this call, if we have questions. Does the record tell us why this gentleman has gone for such a long period of time without treatment? I don't recall that in the record, Judge Lucero. He has not been incarcerated during that time for one reason. Has he been under medical treatment during that time? I don't recall that. How long has Dr. Bograd been his treating physician? I think she was retained for this case. Was solely for this case? That's my understanding, but I could be mistaken. You understand that she is advocating to leaving him in an untreated condition, quite apart from the evaluation? No. She testifies she thinks the medications that the government doctors wish to give him would benefit him, and she would like to see the defendant take them. She just said she had reservations about whether it was going to work or not, and being untreated was only one of them, Your Honor. Another one was his delusions, which the government doctors did take into consideration. She said he was concerned that any attempt to medicate him was simply going to make, I don't think she used the word paranoia, but he thinks the government is out to get him, and that this might fuel those sorts of delusions. She said that was a concern. Wasn't her concern that his delusions, because they've been exacerbated increasingly over 40 years, are basically his self-identity, and that Dr. Bograd then testified that if you try to involuntarily medicate someone to get over their delusions, that could essentially be counterproductive, that could exacerbate their mental problems, because the delusions are what fuels that person. Wasn't that her testimony? I think there was some testimony along those general lines, Judge Bacharach, but her, I think, there's more to it than just speculation. Her professional and informed concerns with that, I don't think measure up very well to lengthy statistical studies and many, many years of experience in people who have actually administered these drugs with schizophrenic illnesses. And where in the record, if I look, for those statistical data or anything that will incorporate analysis of Dr. Bograd's very specific concern with regard to this person's delusions created over a 40-year period that are going to be incorporated within that statistical data or any other evidence in the record that Dr. Sarazin and Dr. Preston presented? Dr. Preston and Dr. Sarazin both indicated they reviewed the report, and both of them, I know Dr. Preston did, I think they both expressly referenced the fact that the defendant was delusional. I don't know if that is different than your normal garden bryo schizophrenia. I thought they all went together. But this is why we have to rely on the experts. And they did consider all of that. Next question. Counsel in his argument, Mr. Orsici, tells us... I'm sorry, Judge. Counsel, I'm sorry. Is that better? Yes, thank you. Counsel, Mr. Orsici tells us that Mr. Seaton is not dangerous to himself or others. He just kind of made that statement. Is that correct? There was a finding below that is not disputed under the Harper case that the defendant is not a danger to himself or others while incarcerated at Springfield. That's the actual standard, yes, that was required at the time. Thank you. I'm sorry to... No, no, that's fine. ...interrupted the two of you, but I wanted to know that. If the court has... I don't believe that defense counsel addressed the first self-factor. They seem to... But if the court has any concerns with it or any questions about it, I'm happy to try and explain why the government thinks it has a very important interest in prosecuting the serious threats that were made. Well, I'd like to hear it. I don't know about... Yeah, please. All right. The only argument against this that I recall from the defendant's briefing... Well, now you're going to tell us what the arguments against it are. I thought you were going to tell us what your interest is, not what your interest isn't. Yes, it's in holding people accountable who make serious threats to kill senators, their children, and their wives. And that interest does not go away merely because someone has mental problems. There's still a strong deterrent interest in it. And the only argument that I've heard against this with any... Well, the only argument advanced by the defense... I'm trying to set up our position, Judge, is that, well, it's possible, depending on how the guidelines run, that he could end up spending more time in custody than his sentence, which is extremely speculative, particularly since we have two counts which together total 15 years statutory maximum. Now, he may not receive that. I acknowledge that. But the fact that he is... I believe at this point the defendant's been in custody for 14, 15 months, something like that. And this is entirely due to dealing with his mental illness, the competency exam, and then the cell hearings. Have the threats continued during that time? I'm sorry? Have the threats continued during that time? The 15 months? I don't believe so. There was something in the record that after the threats in question, he continued to call people and make threats. But I don't, in any event, at this point know he's incarcerated. Well, but I mean, threats can be stated during incarceration. They could. No, I'm not aware of anything like that. But again, measuring the 15 months he's presently served, we can try and predict how much more, if the cell order is upheld, he might spend. That's somewhat speculative. And we can speculate about what his sentence might be. But he hasn't even been convicted. We don't know if he'd plea or go to trial, as I explained in the briefings. Is there any danger that treatment could make the situation worse? Was that considered or discussed? It was considered by all the experts. And even Dr. Bograd, the defense expert, said that she thinks the defendant is currently suffering a great deal because of his illness. And that she thinks those medications would help him, even though she's not confident that they would restore him to competency. Whereas the government doctors think they would, medications would very much be in his interest. The court mentioned that during the hearing, which was actually the fourth cell factor. It's not contested by the defense. Whether medications were in the defendant's best interest. Thank you. Your time is up. Thank you. I just want to make two brief points. With respect to your question regarding dangerousness. So the Harper inquiry has been answered. In this case, Mr. Seedon is not currently dangerous. If the government cannot proceed under cell, then Mr. Seedon would be referred to a civil commitment proceeding. Dr. Preston acknowledged that in her testimony and in her report. That inquiry looks at whether or not he would be a danger to someone, to person or property in the community. That's the federal civil commitment proceedings. He would also potentially be subject to state civil commitment proceedings, which look at that as well as whether or not someone is gravely disabled to take care of themselves. So the idea that a dangerous person would be released is just not applicable in this case. But to allay any concerns regarding that, I wanted to be clear that that would be the next step that the government would have to decide. Now, if the government or other doctors decided he were not dangerous, then there would be a different outcome there. Now, with respect to threats in custody, the only suggestion is in document 64 in footnote 2. It's the government's cell motion. It alleged that Mr. Seedon had tried to make a call to someone after his arrest, to an elected official after his arrest. That doesn't detail the substance of that. It does reference prior calls, uncharged conduct, which is why we included the multiple threats enhancement as a plausible outcome on the guidelines calculations. And on cell's first prong, no one's disputing that the government has an important interest in prosecuting serious felonies. The issue here is that that interest is undermined by the special circumstance recognized in cell in which pretrial detention could equal or exceed the expected sentence under the guidelines, which this court recognized in Valenzuela Puentes, which I cited in the briefing. The court has no further questions. I would just ask you to reverse and yield the rest of my time. I think you do have a question. I just have a guideline question. Both of you did a super job, really, in all your briefs, and in particular this point about the guideline calculation, but I didn't understand it. Is your math on the guideline calculation, isn't that predicated on the threat count, not the Section 115 count? What is the guideline? Have you told us what the guideline calculation is on the 115 count? My time's expired. Can I just briefly respond, obviously? Yes. So I think they would be similar. If they weren't grouped, they would both likely fall under 2A6.1. Then you would have to answer the grouping question, which would then be If they don't group, then it would depend under 3D whether an additional .5, 1, or 2 levels could be added. There would also be possible challenges about double counting in that analysis. To the extent that there's uncertainty again, I would just reiterate it's because the government didn't prove it up. Thank you. Okay. Thank you. Anything further? No, thanks. All right. Thank you. Thank you. The case is submitted. Counselor excused.